Vincent Pharr
Reg. No. 72602-019
Federal Correctional Institution
P.O. Box 800
Herlong, California 96113



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VINCENT PHARR,
                Petitioner,

Case No. 1:19-cr-346-MHC-JSA

v.

UNITED STATES OF AMERICA,
                Repondent.

MEMORANDUM IN SUPPORT OF MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE

I.    JURISDICTION

This Court has jurisdiction to entertain this motion pursuant to Title 28, United States Code, section 2255, which reads, in part, that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the grounds that sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed sentence to vacate, set aside or correct sentence." 28 U.S.C. 2255.

Pharr asserts that his Sixth Amendment right to counsel was violated.

II.    BACKGROUND

On August 13, 2019, Pharr was arrested incident to the discovery of contraband in a Ford Raptor truck he was traveling in as a passenger. Later that same day, law enforcement officials executed a search warrant on an apartment that Pharr had been seen exiting prior to the vehicle stop. Various items were recovered from the apartment, including firearms, cellphones, THC vape cartridges, and vacuum sealed bags containing 18 pounds of marijuana.

On September 11, 2019, a federal grand jury in the Northern District of Georgia returned a three-count indictment against Pharr. Count 1 alleged that Pharr possessed with intent to distribute less than 50 grams of marijuana, in violation of Title 21, United States Code, section 841(a)(1) and 841(b)(1)(D). Count 2

2.

alleged that possessed a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, section 924(c). Count 3 alleged that Pharr possessed a firearm after Pharr had previously been convicted of a felony offense, in violation of Title 18, United States Code, section 922(g).

Pharr subsequently pleaded guilty to Counts 1 and 2 of the Indictment.

On May 5, 2020, the district court sentenced Pharr to 21 months of imprisonment as to Count 1 and 60 months of imprisonment as to Count 2, to run consecutively to the sentence imposed in Count 1 -- for a total term of imprisonment of 81 months, all to be followed by 5 years of supervised release.

Pharr did not file a direct appeal.

III.    STANDARD OF REVIEW

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI.

The United States Supreme Court has held that the Sixth Amendment guarantees a defendant not only a right to counsel, but effective assistance of counsel. See e.g. McMann v. Richardson, 397 U.S. 759 (1970). This right extends to all critical phases of the proceedings, such as trial and sentencing. Rothgery v. Gillespie County, Tex., 554 U.S. 191 (2008).

Ineffective assistance of counsel claims are cognizable in a

section 2255 setting because they are of constitutional dimension.
See Kimmelman v. Morrison, 477 U.S. 365 (1986) and Strickland v.
Washington, 466 U.S. 668 (1984).

To prevail on a claim of ineffective assistance of counsel, a
"defendant must show that (1) his counsel's representation fell
below an objective standard of reasonableness, and (2) there is a
reasonable probability that, but for counsel's unprofessional errors,
the result of the proceeding would have been different." Kimmelman,
477 U.S. at 375.

The "reasonableness of counsel's challenged conduct" must be
judged "on the facts of the particular case, viewed as of the time
of counsel's conduct." Lockhart v. Fretwell, 506 U.S. 364, 371 (1993)
(citing Strickland, 466 U.S. at 690). In the course of the latter
portion of this inquiry, the Court must consider not merely whether
the outcome of the defendant's case would have been different, but
also whether counsel's deficient performance caused the outcome to
be unreliable or the proceeding to be fundamentally unfair. See
Lockhart, 506 U.S. at 368-73. "Unreliability or unfairness does not
result if the ineffectiveness of counsel does not deprive the defend-
ant of any substantive or procedural right to which the law entitles
him." Lockhart, 506 U.S. at 372.

The familiar two-part test of Strickland has been applied by
the Supreme Court and the Circuit Courts in a wide variety of
contextual challenges to the effectiveness of counsel's performance.

4.

See e.g. Padilla v. Kentucky, 559 U.S. 356 (2010)(deportation consequences of a conviction) and Missouri v. Frye, 566 U.S. 134 (2012)(defense counsel's advice with regards to whether to accept a plea offer).

      With regard to the performance prong of the Strickland test, "if a defendant is represented by counsel and pleas guilty upon advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." McMann, 397 U.S. at 761. Once a defendant has satisfied the performance prong, he must then demonstrate prejudice. "[T]o prove prejudice, [defendant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 761-62.

      As is relevant in this particular case, claims of ineffective assistance of counsel during the sentencing phase of the criminal proceeding, "prejudice is established if the movant demonstrates that his sentence was increased by the deficient performance of his attorney." Spencer v. Booker, 254 F. App'x 520, 525 (6th Cir. 2007). Or "in the converse, that his sentence would have been less harsh." Dela Sota-Rivera v. Jones, 2018 U.S. Dist. Lexis 114457, 2018 WL 9649832, at *24 (S.D. Fla. Jul. 9, 2021). See also Glover v. United States, 531 U.S. 198, 203 (2001)("[A]ny amount of actual jail time has Sixth Amendment significance").

5.

Finally, in a ruling on a motion under section 2255, the district court is required to hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. 2255(b). See also McQuiggin v. Perkins, 569 U.S. 383 (2013).

IV.     DISCUSSION

A. Equitable Tolling Due to Extraordinary Circumstances

Prior to discussing his ineffective assistance of counsel claim, Pharr asks that this Court find that his motion is timely under the principle of equitable tolling.

"The statute of limitation can be equitably tolled where a petitioner 'untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence.'" Outler v. United States, 485 F.3d 1273, 1280 (11th Cir. 2007)(internal citation omitted).

In support of his request for equitable tolling, Pharr avers as follows:

Pharr arrived at USP Atlanta (holdover) on or about February 26, 2020. Two weeks prior to his scheduled May 5, 2020 sentencing hearing, Pharr was placed in quarantine in the Special Housing Unit (SHU) at the facility. Immediately following his court appearance, Pharr was placed back into quarantine in SHU, where he remained until he was transferred on or about October 16, 2020.

6.

Upon arriving at the Federal Transfer Center (FTC) in Oklahoma City, Oklahoma, Pharr was placed in quarantine for 28 days. From FTC Oklahoma City, he was transferred to USP Victorville (holdover), California, where he was quarantined for 3 days before embarking on a day-long bus journey to FCI Herlong in Northern California. He arrived at FCI Herlong on or about November 16, 2020 -- arriving just as a full COVID-19 outbreak occurred at the facility. See Exhibit A, Warden's Lockdown Memo. Pharr and other new arrivals were placed in quarantine in the Reno housing unit, where he was quarantined for another 28 days. It should be noted that during the lockdown, Pharr was locked in his cell for 24-hours a day and was denied access to commissary, law library, recreation, and use of the telephones and emails. After his 28 day stay in the Reno housing unit, Pharr was transferred to the Sierra-A housing unit, which still remained on 24-hour lockdown, but the inmates in the unit had all tested negative for COVID-19.

On or about March 1, 2021, the facility began a "modified" lockdown, in which inmates could spend half hour outside of their assigned cells; to shower and use the telephone and emails. However, inmates were denied access to the law library. About a month later, the hours outside the cell were increased to two hours each day along with access to outside recreation for one hour per week. Limited access to the law library was given to

7.

some inmates who had verifiable "open cases." He did not qualify

for this privilege because his criminal case had been closed and

he did not have any motions pending in either the Eleventh Circuit

or the Supreme Court.

On or about May 1, 2021, inmates were allowed outside

of their cells from 6:30 a.m. to 8:30 p.m., along with outside

recreation access three times per week. Limited work oppor-

tunities became available in some areas such as Laundry, Food

Service, Commissary, and Recreation. The law library still remain-

ed open to only a small number of inmates who had open cases,

about 20-25 inmates out of 1156 inmates. On or about June 1,

2021, another inmate housed in Sierra-A housing unit began

working in the law library as a clerk and who recently started ·

assisting other inmates, including Pharr, with their legal cases.

Based on the above facts, Pharr's motion should be deemed

timely due to extraordinary circumstances beyond his control.

Outler, 485 F.3d at 1280.

B.  Ineffective Assistance of Counsel During Sentencing
    Phase of Criminal Proceeding

As noted in the Background section, supra, Pharr was

charged with three counts. Pursuant to a plea agreement with the

Government, he ultimately pled guilty to two of those counts;

possession with intent to distribute less than 50 kilograms of mari-

juana (Count 1) and possession of a firearm in furtherance of a

drug trafficking offense (Count 2). By way of the same plea agreement, the parties agreed that 7.7 kilograms of marijuana were foreseeable to Pharr.

After accepting Pharr's guilty plea, the Court ordered the United States Probation Office (USPO) to develop a presentence report (PSR). Despite the drug amount agreed to by the parties in the plea agreement and the indictment alleging "less than 50 kilograms of marijuana," the USPO determined that Pharr was responsible for between 100 and 400 kilograms of marijuana. The base offense level for that quantity of marijuana was 18 under U.S.S.G. 2D1.1(c)(3). The PSR also determined that two-levels should be added for "maintain[ing] a premises for ... distributing a controlled substance," under U.S.S.G. 2D1.1(b)(12); and three-levels should be subtracted for acceptance of responsibility, pursuant to U.S.S.G. 3E1.1. Thus, Pharr's adjusted offense level as calculated by the PSR was 17. This offense level, coupled with a criminal history category IV, produced an advisory guideline range of 97-106 months.

Defense counsel objected to the drug amount found in the PSR. Counsel argued that the plea agreement specifically stated that only 7.7 kilograms of marijuana was attributable to Pharr. This would produce a base offense level of 12 rather than 17. However, because Pharr's offense level would then be less than 12, he could only receive a two-level reduction for acceptance of respon-

9.

sibility. With an adjusted offense level of 12 and a criminal history category IV, Pharr's advisory guideline range would be 21-27 months.

At the sentencing hearing, the Court found that Pharr was responsible for 7.7 kilograms (18 pounds) of marijuana and that both the two-level enhancement for maintaining a drug premise and the two-level reduction for acceptance of responsibility applied. The Court then sentenced Pharr to 21 months' imprisonment as to Count 1. After finding that Pharr had possessed a firearm in furtherance of a drug trafficking offense, the Court sentenced Pharr to 60 months of imprisonment as to Count 2, to run consecutively to Count 1; to be followed by 5 years of supervised release.

Pharr contends that defense counsel provided ineffective assistance of counsel during the sentencing phase of the criminal proceeding in two distinct ways: (1) counsel failed to seek a minor role adjustment for Pharr and (2) counsel failed to seek a reduced sentence due to the COVID-19 pandemic.

1.  Minor Role Adjustment

Section 3B1.2 of the Sentencing Guidelines provides a decrease to a defendant's base offense level by up to four levels "[i]f the defendant was a minimal participant in any criminal activity, "two levels "[i]f the defendant was a minor participant in any criminal activity," and three levels if the defendant's level

of participation fell between minimal and minor. See U.S.S.G.

3B1.2. The commentary to section 3B1.2 provides that a miti-

gating role adjustment is available to any defendant "who plays a

part in committing the offense that makes him substantially less

culpable than the average participant." U.S.S.G. 3B1.2 cmt.

n.3(A). Though the defendant bears the burden of proving that he

or she is entitled to a downward adjustment based on his or her

role in the offense.

The Sentencing Guidelines provide for a two-level decrease

to a base offense level if a defendant was a minor participant in

the criminal activity. U.S.S.G. 3B1.2(b). A minor participant is

one "who is less culpable than most other participants in the

criminal activity, but whose role could not be described as mini-

mal." Id. cmt. n.5.

Prior to Amendment 794, a circuit split developed concern-

ing the proper interpretation of "the average participant" in the

context of the minor role adjustment. See e.g. U.S.S.G. App. C,

Amend. 794. The First and Second Circuits allowed defendants to

compare their culpability to that of their co-participants and to

other persons participating in similar crimes (typical hypothetical

offenders). The Eleventh Circuit, however, determined that the

appropriate comparison was between the defendant and other

participants in the same criminal scheme. See e.g. United States

v. Da Varon, 175 F.3d 930 (11th Cir. 1990). In Da Varon, the

11.

Eleventh Circuit held that when considering a request for a minor role reduction, sentencing courts are to consider: "first, the defendant's role in the relevant conduct for which he has been held accountable at sentencing, and second, his role as compared to that of other participants in his relevant conduct." Id. at 940.

Amendment 794 resolved the circuit split in favor of the view espoused by the Eleventh Circuit. The amendment also enumerated a "non-exhaustive list of factors," United States v. Cruickshank, 837 F.3d 1182, 1193 (11th Cir. 2016), for courts to consider when deciding whether to grant a minor role adjustment. Specifically, Application Note 3(C) to U.S.S.G. 3B1.2, provides:

In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors.

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the

12.

defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline.

The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.

U.S.S.G. Supp. App. C, Amend. 794 (November 1, 2015).

Applying the above factors to the instant case, Pharr was entitled to a minor role reduction because his task was to merely guard the stash house when a drug shipment arrived and to return to California once the supply had been delivered to local drug runners, though even that theory was never proved in court.

The criminal scheme -- conspiracy, actually -- involved tens of millions of dollars and a host of players, though only Pharr was prosecuted and given nearly seven years in prison.

It all started in sunny California where the use of marijuana is legal, at least on the state level. In northern California, marijuana plants were grown, cultivated to perfection, harvested, and

13.

packaged for transport to other states. In another part of the state a company called Cali Plug legally manufactured vape pens and "gummie" products infused with cannabis and cannabis oil. Both the marijuana and Cali Plug products were packed into a tractor trailer and driven across the country to various states. The truck would deliver it products and then pick up cash for the return trip to California. It was this latter portion of the operation that began the investigation that eventually ensnared Pharr.

As was well documented in the court's record, law enforcement officials had been investigating in another state a person suspected of drug dealing when a truck from California arrived to deliver one of its load. Investigators followed the truck to Atlanta, Georgia. In Atlanta, the truck was met by Rama Moore, who delivered nearly $4 million in cash. The agents with the Drug Enforcement Agency (DEA) took surveillance photographs of Moore making the delivery. As the truck made its return trip to California, it was stopped and searched, whereupon the $4 million in cash was discovered. At the same time, DEA agents ran the license plate number of the vehicle that Moore had driven to the drop-off. It was learned that it was a rental car rented by an individual named Hessian Robinson. The DEA expanded its investigation once more. Using the address listed on the car rental agreement, DEA agents began surveiling Robinson's home. On an almost daily basis Robinson left his home and made frequent stops at an apartment. A later

investigation confirmed that the apartment had been rented by yet

another individual in the criminal scheme. According to the landlord,

Robinson was usually the person who paid the rent on the apartment.

The surveillance of Robinson and the apartment lasted for four

months. Tellingly, according to the DEA, its agents never saw Pharr

at the apartment until the day of his arrest on August 13, 2019.

Unfortunately for Pharr, on that particular day Rama Moore showed

up. The DEA agents were well aware of Moore, having witnessed him

deliver nearly $4 million to the truck driver four months early, in May

2019. So it was little wonder that the DEA agents decided to follow

Moore and Pharr from the apartment after seeing them place a book

bag and suitcase into the back of the truck at the apartment. The

DEA agents suspected that the bags contained millions of dollars

from the sale of illegal drugs. After following the pair for awhile,

the DEA agents had local law enforcement officers effect a traffic

stop. Moore had been driving the vehicle that day while Pharr was

a passenger. A subsequent search of the vehicle yielded 8 THC

gummies in the center console. Both Moore and Pharr were arrested

that day. Finally, a later search of the apartment yielded cell phones,

fully and empty gummy containers, THC vape cartridges, and vacu-

um sealed bags containing 18 (7.7 kilograms) pounds of marijuana

in one room, and separately, several firearms in another room that

contained documents that belonged to Pharr.

15.

As the above narrative demonstrates, Pharr was "less culp-able than most other participants in the criminal activity." U.S.S.G. 3B1.2(b), cmt. n.5.

Following the dictates of Da Varon, the Court first reviews "the defendant's role in the relevant conduct for which he has been held accountable at sentencing." Da Varon, 175 F.3d at 940. In this case, the Court found that: (1) Pharr was accountable for 7.7 kilo-grams (18 pounds) of marijuana, (2) he maintained a premise for distributing a controlled substance, and (3) he possessed a firearm in furtherance of a drug trafficking offense. Second, the Court then reviews the defendant's role "as compared to that of other partici-pants in his relevant conduct." Id. Importantly, whether the other participants were charged is not relevant.

"[A] court must measure the defendant's role against the relevant conduct for which the defendant is held accountable at sentencing, whether or not other defendants are charged." U.S.S.G. App. C, Amend. 635, Reasons for Amendment (emphasis added).

There were numerous participants in this criminal scheme who ran the gamut from minimal participant to full-fledged leader-ship. Though as this Court may well remember, none of these other participants were ever charged. In comparing the roles in this criminal scheme, there was one minimal participant. That was the individual who rented the apartment so that Robinson could use it as a stash house. Had the Government charged this person, he too

16.

would have faced charges of possession with intent to distribute

marijuana and possession of a firearm in furtherance of a drug

trafficking offense. This would be true because it was his name that

was found on the lease agreement, which means that he was respon-

sible for everything found in that apartment (this fact would be even

more damaging if he had rented other apartments for Robinson's

use). And of course, if he were found guilty and sentenced, he would

have been subjected to the enhancement for maintaining a premise

for distributing a controlled substance.  Moving up the chain, there

was the truck driver who hauled tons of marijuana, worth millions of

dollars, across the country, violating an untold number of federal and

state laws in the process. For example, he violated 21 U.S.C. 849 by

possessing drugs at a protected location (truck stop) and traveling

on an Interstate highway. See also U.S.S.G. 2D1.2. Then after

delivering his illegal products, he transported millions of dollars in

cash from the sale of illegal drugs back across the country to Cali-

fornia. This is not a hypothetical. The DEA actually seized $3.9

million in cash from the tractor trailer in May 2019. A pound of

marijuana sold for $2,100 in Atlanta; thus, the $3.9 million seized

represented approximately 1,857 pounds (794 kilograms) of mari-

juana. This meant that the truck driver could have been charged

with conspiracy to possess with intent to deliver more than 1000

kilograms of marijuana (for the marijuana he delivered and the cash

he picked up), a 10-year mandatory minimum sentence under 21

U.S.C. 841(b)(1)(A).

"In estimating the quantity of drugs, a district court may con-
vert cash into drug quantities based upon a determination that the
cash represented drug transaction proceeds." United States v. Perez,
785 F. App'x 207, 208 (5th Cir. 2019)(citing United States v.
Johnston, 127 F.3d 380 (5th Cir. 1997)). See also U.S.S.G. 2D1.1
cmt. n.5. He could also have been charged with money laundering
pursuant to 18 U.S.C. 1956(a)(1) and use of a communication facility
to conduct illegal activity (to set up rendezvous times and locations),
in violation of 21 U.S.C. 843(b). Hessian Robinson, whom the DEA
surveiled for four months and who visited the apartment on an
almost daily basis during those four months, paid the monthly rent
on the apartment, according to the landlord. This was a violation of
21 U.S.C. 856 (Maintaining a drug-involved premise). He also rented
the Dodge Caravan that Rama Moore used to transport the $3.9
million to the truck driver. Robinson could have been charged with
not only conspiracy to possess with intent to distribute marijuana
under 21 U.S.C. 846 and possession of a firearm in furtherance of
a drug trafficking offense pursuant to 18 U.S.C. 924(c) based on
the evidence recovered from the apartment, he could have been
charged with money laundering (for example, a receipt for his bank
account was recovered from the truck). As to Rama Moore, he
seemed to have many of his fingers in the pie -- though remarkably,
after his arrest by state law enforcement officials, all charges were

dropped against him. As noted above, Moore delivered nearly $4 million to the truck driver. While doing so, he drove to the rendezvous location in a vehicle rented by Robinson, who paid the monthly rent on the stash house. When arrested, Moore claimed the $65,000 found in a suitcase during the traffic stop. It was not difficult to connect the dots in this case. And despite the fact that the Government elected not to prosecute these individuals, they were all "participants" in the criminal scheme.

"A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. 3B1.1 cmt. n.1.

Unlike Pharr, each of the other participants (except perhaps the individual who rented the apartment) had to know the scope and structure of the criminal activity. The leader(s) would not have entrusted $3.9 million to another's care without absolute trust in that person (truck driver, Robinson, and Moore). Critically, the Court never found that Pharr participated in the planning of the criminal scheme or that he exercised any decision-making authority. The only theory put forward with regards to Pharr's role in the scheme was that he guarded the stash house, and that belief was founded on the fact that the firearms were found in a separate room in the apartment where apparently Pharr slept when he visited Atlanta (though the firearms bore neither his fingerprints nor DNA). Pharr would have simply been

19.

paid a fee for this service and did not have any proprietary
interest in the criminal activity. Indeed, it is telling that when he
was arrested Pharr was not armed; meaning that he was not provid-
ing protection for Moore or the $65,000 in cash that Moore had in
his suitcase.

All this demonstrates that Pharr was significantly less culp-
able than the other participants in the criminal scheme. Thus, under
section 3B1.2, he would have been eligible for a two-level minor role
reduction. It was, therefore, an error for defense counsel not to
seek a minor role adjustment -- as he would have had little to lose
by doing so, but much to gain had he done so.

Iudex Decidere Debet -- as the Latin phrase commands,
defense counsel should have let the judge decide as to whether to
grant the adjustment rather than defense counsel denying Pharr
that opportunity. See Gordon v. United States, 518 F.3d 1291, 1301
(11th Cir. 2008)(no competent counsel would have taken the action
that his counsel did take"). See also Brownlee v. Haley, 306 F.3d
1043 (11th Cir. 2002)(finding that counsel performed deficiently
when counsel failed to present mitigating circumstances to the
jury during the sentencing phase of the criminal proceeding).

Counsel's deficient performance prejudiced Pharr by subject-
ing him to a harsher sentence. Had defense counsel sought and the
Court granted a two-level minor role reduction, Pharr's adjusted
offense level would have become 10. When combined with his

20.

criminal history category VI, his advisory guideline range would have been 15-21 months. Thus, his guideline range would have been six months less. This is enough to demonstrate prejudice.

In Glover v. United States, the defendant was convicted of racketeering, money laundering, and tax evasion. The U.S. Probation Office prepared a PSR and recommended that the defendant that the three charges be grouped together under U.S.S.G. 3D1.2, which allows for the grouping of counts involving the same harm. The Government objected to the grouping and when the defense attorney failed to argue the point, the Court agreed with the Government's position and separated the offenses of conviction. The defendant's adjusted offense level was thus increased by two levels, resulting in an increased sentence of between 6 and 21 months. After his conviction became final, the defendant filed a motion to correct, set aside or vacate sentence pursuant to 28 U.S.C. 2255, arguing that defense counsel provided ineffective assistance of counsel by failing to pursue the grouping issue. The district court, however, denied the motion after finding that the 6 to 21 month sentence increase was not significant enough to meet the prejudice prong of the Strickland test. The Seventh Circuit affirmed the lower court's decision. On certiorari, the Supreme Court reversed the decision. In doing so, it declared that "[a]ny additional jail time has Sixth Amendment significance." Id. at 203.

Based on the Supreme Court's holding in Glover, Pharr has

demonstrated that defense counsel's deficient performance, pre-

judiced his case by subjecting him to a harsher sentence. Spriggs

v. Collins, 993 F.2d 85, 88 (5th Cir. 1993)(holding "that if an

increased prison term did flow from an error [of counsel] the

petitioner has established Strickland prejudice"). Thus, Pharr

is entitled to finding by this Court that defense counsel provided

ineffective assistance of counsel, in violation of the Sixth Amend-

ment to the United States Constitution.

2.  Coronavirus Pandemic

Pharr's detention for months in the county jail and federal

prison in Atlanta during the ongoing COVID-19 pandemic was an

extraordinary situation warranting defense counsel to seek a

reduced sentence for Pharr. At the time of Pharr's sentencing on

May 5, 2020, the effects of the virus on the BOP, state prisons,

and other correctional facilities was well know. Thousands of

inmates had contracted the virus around the country and

hundreds had died from the deadly coronavirus; resulting in lock-

downs, reduced educational programming, and lack of work

opportunities. Indeed, as the Court noted at Pharr's sentencing

hearing:

> Just a preliminary matter, in accordance with
> the CARES Act H.R. 748 and General Order 20-04
> of this court entered by the chief judge on March
> 30 of 2020, the use of video teleconference
> during the COVID-19 emergency is authorized for

> any sentencing hearing if the district court in a
> particular case finds for specific reasons that the
> sentencing cannot be further delayed without
> serious harm to the interests of justice and,
> second, the defendant consents to participate
> in the sentencing by video teleconference after
> consultation with counsel.

Sentencing Transcripts (May 5, 2020), at 2-3.

As the above denotes, the district court had taken the extraordinary step of conducting sentencing hearing via Zoom teleconferencing due to the COVID-19 pandemic and, it had done so more than a month prior to Pharr's sentencing. This put defense counsel on notice, or should have put him on notice, that the situation was extraordinary. He was further put on notice when Pharr was transferred from the country jail to U.S.P. Atlanta and that Pharr's life was at risk. As Pharr's attorney, Mr. Larry Wolfe, noted at the sentencing hearing:

"My client was transferred from Lovejoy after entering his plea, and has been at the federal penitentiary, out on Boulevard. He's on 24-hour lockdown there, and there is COVID HIV -- not HIV -- coronavirus out at the prison." Sentencing Transcripts (May 5, 2020), at 3.

A district court generally considers the sentencing factors listed in 18 U.S.C. 3553(a) when determining an appropriate sentence for a particular defendant. As is relevant here, section 3553(a)(2)(D) directs a sentencing court to consider the need "to provide the defendant with needed educational or vocational

23.

training, medical care, or other correctional treatment in the

most effective manner." 18 U.S.C. 3553(a)(2)(D).

Hypertension and obesity together have long been held to

present "a serious physical or medical condition ... that substant-

ially diminishes the ability of the defendant to provide self-care

within the environment of a correctional facility." See, for

example, United States v. Johnson, 464 F.Supp.3d 22, 38 (D.D.C.

May 16, 2020)(finding that defendant's hypertension and obesity

"[are] sufficient to 'diminish[]' Johnson's ability 'to provided self-

care within the environment of a correctional facility' for purposes

of the Sentencing Commission's policy statement").

It should be noted here, however, that Pharr present claim

is vastly different from those individuals who have sought com-

passionate release pursuant to 18 U.S.C. 3582(c)(1)(A), wherein

they have alleged "extraordinary and compelling circumstances."

While some courts have reduced sentences for individuals who

exhibited the above medical conditions during the pandemic, other

courts have declined to grant relief. Compare, United States v.

McIntosh, 2020 U.S. Dist. Lexis 206321 (S.D. Fla. July 6, 2020)

(granting compassionate release to a defendant who suffered from

obesity, hypertension, high cholesterol, and diabetes) with United

States v. Lockley, Case No. 1:17-cr-00127-MHC-JKL, Doc. No. 190

(N.D. Ga. Oct. 5, 2020)(finding no extraordinary and compelling

reason for a 26-year-old African American man who presented with

obesity and hypertension). In the instant case, Pharr had not yet

been sentenced, so his requested relief would have come from

either seeking a variance under section 3553(a)(2)(D) or a down-

ward departure pursuant to U.S.S.G. 5H1.4.

"[I]n some situations, a district court may impose a non-

prison sentence when a defendant has serious medical needs.

Section 3553(a)(5) directs the district court to consider the policies

of the Sentencing Commission [such as section 5H1.4] when deter-

mining a sentence, and [ ] 3553(a)(2)(D) explicitly states that the

effective provision of necessary medical care is an appropriate

factor for the district court's consideration in sentencing." United

States v. Wadena, 470 F.3d 735, 739 (8th Cir. 2006).

Pharr's medical records indicated that he suffered from

hypertension (also known as high blood pressure), heart murmur,

and obesity. His medical records show that Pharr was 73 inches in

height and weighed 350 pounds, giving him a body mass index (BMI)

greater than 55. See "Healthy Weight: Adult BMI Calculator,"

https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/

english_bmi_calculator/bmi_calculator.html (last accessed June 17,

2020). The Centers for Disease Control and Prevention (CDC)

specified that an individual with "severe obesity, that is those,

with a body mass index ('BMI') of at least 40, are at a higher risk

for severe illness due to COVID-19." McIntosh, 2020 U.S. Dist.

Lexis 206321, at *5. Further, the CDC has specifically stated that

hypertension is "associated with increased illness severity and adverse outcomes" in COVID-19 patients. See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19, Ctrs. for Disease Control & Prevention (Apr. 3, 2020)).

"Nearly half of adults [in the U.S.] live with high blood pressure, also called hypertension. It's defined as a blood pressure reading of 130/80 mm Hg or higher, or by taking medication for the condition. High blood pressure increases your risk of having a heart attack or stroke ... Symptoms usually appear only after damage to your heart and blood vessels." NIH News in Health, National Institutes of Health (Nov. 2020), at 4 (found at https://www.newsinhealth.nih.gov/2020/11)(last accessed on June 20, 2021).

Yet, Pharr's situation was far more serious than when the average defendant appears in court for sentencing. He would be dealing with the above cited serious medical conditions in a prison setting during a time of the COVID-19 pandemic. Courts have recognized that harsh conditions of confinement are a valid factor supporting a shorter custodial sentence. United States v. Spano, 476 F.3d 476, 479 (7th Cir. 2007)(endorsing the proposition "that the harsher the conditions the shorter the sentence should be").

Given Pharr's medical conditions and the ongoing pandemic, it was an error for defense counsel not to seek either a variance

under section 3553(a)(2)(D) or a downward departure pursuant to U.S.S.G. 5H1.4.

Defense counsel's deficient performance (as outlined above) denied the Court the opportunity to make an accurate assessment of Pharr and his circumstances, which ultimately resulted in Pharr receiving a harsher sentence.

As previously noted, Pharr was convicted of possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. 924(c)(1)(A). That statute required the Court to sentence Pharr to a 5-year mandatory minimum sentence. But that was the floor, the amount of time that the Court could not go below. Yet as already discussed, Pharr was sentenced to a term of 81 months of imprisonment. The Court, however, did not have to sentence Pharr to a term of 21 months as to Count 1. The Court could have sentenced him to as little as one day on Count 1. This was permissible under Supreme Court precedent.

In Dean v. United States, 137 S.Ct. 1170, 197 L.Ed.2d 490 (2017), the defendant and his brother committed two robberies of drug dealers. During the robberies, a firearm was used. The defendant was convicted of multiple robbery and firearm counts, as well as two counts of possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. 924(c). The two 924(c) violations alone carried a 30-year mandatory minimum sentence. During his sentencing hearing, the defendant asked the district

.27.

court to take into consideration that he faced a 30-year man-

datory minimum sentence for the 924(c) violations and asked

the district court to impose a one-day sentence for the other

counts. Though the judge said that he was inclined to sentence

the defendant to the one-day sentence, the judge felt that the law

did not permit such a sentence and thus, sentenced the defendant

to a guideline sentence on the other counts. The defendant appeal-

ed the district court's ruling. The Court of Appeals, however, ruled

that the defendant's argument was foreclosed by Circuit precedent

and that the defendant's sentence was otherwise reasonable. On

certiorari, the Supreme Court reversed. It found that a number of

statutes, including 18 U.S.C. 3553(a) counseled that a district

court should take into consideration the totality of the sentencing

package when determining an appropriate sentence for each count.

As the Court noted "[a]s a general matter, these sentencing pro-

visions permit a court imposing a sentence on one count of con-

viction to consider sentences imposed on other counts." Id. at

1173.

Based on the Supreme Court's holding in Dean, Pharr could

have been given a sentence of 5 years and one day, if not for the

deficient performance of Pharr's defense counsel.

Having shown that defense counsel's performance was

deficient and that but for counsel's deficient performance, his

sentence would have been less harsh, Pharr is entitled to a find-

ing by this Court that defense counsel did not provided the assist-
ance of counsel required by the Sixth Amendment to the United
States Constitution.

## CONCLUSION

For the foregoing reasons, Pharr respectfully asks that this
Honorable Court find that defense counsel provided ineffective
assistance of counsel during the sentencing phase of his criminal
proceeding and remand his case for resentencing.

Respectfully submitted,


Vincent Pharr
Reg. No. 72602-019
Federal Correctional Institution
P.O. Box 800
Herlong, CA 96113

7/13/21
DATE

CERTIFICATE OF SERVICE

I, Vincent Pharr, hereby certify that a true and accurate

copy of the foregoing Motion to Vacate Sentence has been sent

on this day, through the U.S. Mail, postage prepaid, to:

Calvin A. Leipold, III, AUSA
United States Attorney's Office
Suite 600, Richard Russell Bldg.
75 Ted Turner Dr., S.W.
Atlanta, GA 30303

Executed on this _14TH_ day of ___JULY___, 2021,

at Herlong, California.

Vincent Pharr
Federal Correctional Institution
P.O. Box 800
Herlong, CA 96113

## MOTION BY A PERSON IN FEDERAL CUSTODY
## TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

| UNITED STATES DISTRICT COURT | Division | Atlanta |
|---|---|---|
| Vincent Pharr | 72602-019 | 1:19-cr-00346-MHC |
| FCI Herlong, P.O. Box 800, Herlong, CA 96113 | | |
| VINCENT PHARR              V. | UNITED STATES OF AMERICA | |

### MOTION

1. Name and location of court which entered the judgment of conviction under attack: _____

United States District Court for the Northern District of Georgia

2. Date of judgment of conviction: _____ May 5, 2020 _____

3. Length of sentence: _____ 81 Months _____

4. Nature of offense involved (all counts): _____

Possession with intent to distribute a controlled substance
Possession of a firearm in furtherance of a drug trafficking offense

5. What was your plea? (Check one)
    (a) Not Guilty
    (b) Guilty   *
    (c) Nolo contendere

If you entered a guilty plea to one count or indictment, and not a guilty plea to another count or indictment, give details: _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
    (a) Jury
    (b) Judge only

7. Did you testify at the trial?     Yes          No   *

8. Did you appeal from the judgment of conviction to the Court of Appeal?
   Yes ____    No *

9. If you did appeal, answer the following:

   (a) Result: _____

   (b) Date of result and mandate: _____

10. Did you file a petition for rehearing?
    Yes ____    No *

11. If you did file a petition for rehearing, provide the date and result of the petition: _____

_____

12. Did you file a petition for certiorari review?
    Yes ____    No *

13. If you did file a petition for certiorari review, provide the date and result of the petition: _____

_____

14. Have you previously filed any post-conviction petitions, applications or motions, including previous
    § 2255 motions, with respect to this judgment in any federal court?
    Yes ____    No *

15. If your answer to 14 was "yes," give the following information:

    (a)  (1)  Name of court: _____

         (2)  Nature of proceeding: _____

    _____

         (3)  Grounds raised: _____

    _____

    _____

    _____

    _____

    _____

         (4)  Did you receive an evidentiary hearing on your petition, application or motion?
              Yes ____    No ____

         (5)  Result: _____

         (6)  Date of result: _____

2

(b) If you filed more than one such petition, please include the same information requested in 11(a) on a separate sheet of paper.

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on your petition, application or motion?
   (1) First petition, etc.         Yes       No
   (2) Second petition, etc.      Yes       No

(d) If you did *not* appeal from the adverse action of any petition, application or motion, explain briefly

why you did not: _____

_____

_____

_____

16.  State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States.  Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting the same.

**Caution: If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.**

A.  Ground one: ___Ineffective Assistance of Counsel_____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

Defense counsel provided ineffective assistance of counsel during the sentencing phase of criminal proceeding (please see attached Memorandum in Support of Motion to Vacate Sentence)   .

_____

_____

B.  Ground two: _____Not Applicable_____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

3

C.   Ground three: _____Not Applicable_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

D.   Ground four: _____Not Applicable_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

17.  As to the grounds listed in 16A, B, C, and D, explain whether any grounds were previously presented,

and for those that were not previously presented, state *briefly* your reasons for not presenting them: _____

_____

Claims of ineffective assistance of counsel are not cognizable on direct review.
See Massaro v. United States, 538 U.S. 500 (2003).

_____

18.  Do you have any petition or appeal now pending in any court as to the judgment under attack?

      Yes        No *

19.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment
under attack?

      Yes        No *

      (a)  If so, give name and location of court which imposed sentence to be served in the future:  _____

_____

4

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
   Yes          No

20. What relief do you request from this Court? _____

Pharr asks this district court to vacate his sentence

_____

   Wherefore, movant prays that the Court grant the relief to which he or she may be entitled in this proceeding.


                              N/A
            _____
                      Signature of Attorney (if any)



I declare under penalty or perjury that the foregoing is true and correct.  Executed on:


7/13/21                          Vincit Phm
_____                 _____
(Date)                           Signature of Movant/Defendant



                    IF MAILED BY PRISONER:

   I declare or state under penalty of perjury that this petition was (check one):
□ delivered to prison officials for mailing, or  ☒ deposited in the prison's internal mail system on:
7/14/21        (date).


                                 Vinct Phm
                                 _____
                                 Signature of Movant/Defendant

Revised 07/02

                              5

# Notice to the Inmate Population at FCI Herlong, California

12\7\2020

From:  Paul Thompson, Warden

## COVID-19 Status at FCI Herlong, California

On November 18, 2020, 3 inmates in the general population tested positive for COVID - 19.  The entire institution was placed on quarantine.  Since that day, inmates from additional housing units have tested positive for COVID-19.  Inmates reported minor symptoms to staff, were assessed by Health Services and were tested via rapid test with additional PCR testing.  Health Services staff have increased rapid and PCR testing in all affected housing units.  Additionally, serial testing has been conducted in all housing units to determine if there are additional housing units affected.

All inmates with positive COVID-19 results were and continue to be placed into isolation in accordance with established CDC guidelines.  Unit assignments for some inmates are changing based on total isolation cases within each housing unit as results of either positive or negative COVID-19 results become available.  Inmates are continuing to recover from COVID-19.  Inmates in recovered status will be used to supplement inmate work details and inmate services as a move toward modified operations continue.

I encourage you to immediately report to staff any symptoms or illness so you may be appropriately evaluated timely.  In addition, please report any symptoms of Acute Loss of Smell or Taste.  This can be a common symptom of pre-COVID-19 illness and if you are experiencing these symptoms you need to inform staff immediately so you can be assessed by the Health Services staff.

The executive staff, Health Services and I are monitoring the status of FCI Herlong daily and will continue to make adjustments to institution operations and inmate services as needed to ensure a safe return to a normal modified operation.

Your Unit Team should have already issued you 2 stamps to allow immediate communication with your family.  I anticipate expanding opportunities for communication with your family as soon as safely possible.  I appreciate your cooperation during this difficult and unique situation.  With continued cooperation and successful preventative strategies I have confidence we will continue on the right path.

Be safe and be well!

VINCENT PHARR
REG. NO 72602019
FEDERAL CORRECTIONAL INSTITUTION
P.O BOX 800
HERLONG CALIFORNIA 96113



RENO, NV P&DC 895

⇔72602-019⇔
Clerk Of Court
U.S. District Court
75 TED Turner DR SW
2211 U.S. Courthouse
Atlanta, GA 30303
United States

[Legal Mail]

